FINDINGS OF FACT, CONCLUSIONS OF LAW
OPINION
ADKINS, J.
The Court makes the following findings of fact and conclusions of law:
FINDINGS OF FACT
1. Plaintiff and defendant were married February 31, 1931, in Maryland while both attended the University of Maryland. Defendant was domiciled in the District of Columbia, living with his parents in Takoma Park. Defendant was a radio engineer and had some skill as an automobile mechanic. He worked during vacations and Christmas holidays and at odd jobs at other times, but such earnings were not sufficient to support him. Defendant’s parents invited him and his wife while attending school to live at their home in Takoma Park.
2. After a short trip to Richmond plaintiff and defendant went to the home of defendant’s parents and lived there until *83 June, 1931. Their married life was not particularly happy and they indulged in a number of quarrels. Plaintiff was not in the best of health, and defendant accused her of constant nagging. Defendant testified that his love for his wife ceased about thirty days after the marriage, and that during their quarrels he told her of this fact. Later he said his affection did not altogether cease until Saturday, June 9, 1931, when his wife threatened to sue him for divorce. Several times between February and June plaintiff returned to the home of her parents or brother in Baltimore for short stays. One such visit occurred in March; in Baltimore her trouble was diagnosed as arthritis and she was under the care of a physician for several weeks, after which she returned to her husband in Takoma Park. On June 5 plaintiff went to Baltimore to visit her brother’s family. On June 9 she returned to Takoma Park, bringing a small niece with her. The parties disagreed as to what transpired on this occasion. Plaintiff testified she endeavored to make arrangements with her husband for the summer, and that she was obliged to return to Baltimore that night because of the young niece. Defendant testified she informed him she was leaving him and would bring suit for divorce and so entangle him that he could never escape.
I find as a fact that neither party was guilty of cruelty to the other.
3. Plaintiff contends that her troubles were caused by the interference of her mother-in-law. I find as a fact that this contention is disproved and that defendant’s relatives left plaintiff and defendant to adjust their own difficulties.
4. On Monday, June 11, following defendant left Washington, telling his people he was going to seek work, and that he might go to New York. His mother understood he would be back ready for school in the fall. Defendant testified that one reason for leaving was the threat of his wife to entangle him in divorce litigation. He started toward Baltimore but before reaching that city decided to go west. He drove west *84 ward thinking over his troubles and trying to decide what course to pursue. About the third day out he decided to go to Reno and obtain a divorce from his wife. He reached Reno by June 20, possibly a day or two earlier. The first thing he did was to endeavor to employ a lawyer. He visited several, and on June 20 employed a lawyer who sent him to board with a friend at Sparks, a suburb of Reno. The six weeks’ residence required by the Nevada statute expired on August 3. Defendant’s suit was filed the next day; it was based on the ground of extreme cruelty.
5. Early in July defendant wrote his sister at her office asking her to lend him money with which to pay his expenses. She did not notify her parents of this letter. Late in July defendant wrote his mother. In the meantime plaintiff had become worried about her husband, and made several visits to his home, but his parents told her they did not know where he was. Plaintiff’s first notice of her husband’s whereabouts came from a Washington lawyer asking her to sign a waiver in his divorce suit. This she declined to do.
8. Upon learning of defendant’s whereabouts plaintiff wired her husband’s lawyer asking him to have her husband call her by telephone in Baltimore reversing the charges. Defendant made this call. As a result of this talk and from some letter written her by defendant plaintiff gained the impression that her husband was not receiving proper care and that if she could talk over matters with him in person she could persuade him to dismiss the divorce suit. Thereupon she and a married sister drove to Reno in an automobile, arriving about August 18. She immediately got in touch with her husband and they had a number of friendly interviews. She urged him to dismiss the suit and to return east and to thereafter live with her. She testified he said he ought to go through with the divorce, having gone so far. She went by appointment with her husband to see his lawyer. There she was served *85 with, process in the divorce case but this service was not filed in court. Her husband’s lawyer advised her to see another lawyer but she refused to do so. Finally she signed an answer prepared at her request by her husband’s lawyer. In this answer she said she did not have sufficient knowledge to form a belief as to her husband’s domicile and therefore denied the allegation as to his residence. She denied she had been guilty of extreme cruelty toward defendant. In the event a decree of divorce should be granted to plaintiff she asked that she be permitted to resume her maiden name. Accompanying the answer was a waiver of all notice of further proceedings.
Plaintiff testified that her husband told her he would either dismiss the suit or would remarry her. I find she understood her husband was going ahead with the suit and that he expected to obtain a decree within a few days. Plaintiff further testified that on two occasions while she and her husband were together in or near Reno they had sexual intercourse. This defendant denied.
Plaintiff and her sister left Reno on the Friday afternoon before the suit was tried.
7. The divorce suit was tried on the afternoon of Tuesday, August 25, 1931; defendant and his landlady were the only witnesses. On the question of residence he testified he had lived in Sparks since June 20, and that when he came there to live it was for the purpose of making Nevada his home for an indefinite period of time. In the finding of fact the court found that Laurence J. Holt for six weeks immediately preceding the filing of the suit had been and was then an actual and physical resident of Washo County, Nevada, and during all of said period has been and now is actually domiciled therein.
On the afternoon of Wednesday, the day after the trial, defendant started for home. He has never returned to Nevada.
On the whole evidence I find that defendant’s sole purpose in going to Reno was to obtain a divorce and that he had *86 no purpose of residing there permanently or of making his domicile in Nevada.
8. Sometime early in October plaintiff visited defendant at the latter’s home in Takoma Park and informed him she was pregnant. He denied paternity of the child. A month or so later plaintiff suffered a miscarriage. She did not receive proper medical treatment at the time and the results have been serious. She has spent much time in the hospital and has been treated by a number of physicians. At present she is employed part time in the office of a physician at $35 a month but she is not able to work regularly.
9. On returning to Washington in August, 1931, defendant obtained employment. He testified he was discharged the day before Thanksgiving. On the Saturday after Thanksgiving he received a letter from plaintiff’s attorney notifying him the latter would institute proceedings for support unless some arrangement to that end could be made. Defendant communicated with his lawyer in Washington who advised him to return to Reno. On the following Monday defendant left for Bridgeport, Connecticut, where he remained for some months at the home of a widowed cousin living in Bridgeport, whose husband had recently died, who had suggested that he come and live at her home and go to college. I find that his principal reason for going to Bridgeport was to escape being served with process in this suit.
CONCLUSIONS OF LAW
1. Defendant did not obtain a domicile in the state of Nevada but simulated residence there; throughout the period involved his domicile was in the District of Columbia.
2. The Nevada divorce is not entitled to full faith and credit under the Constitution.
3. Plaintiff was not guilty of cruelty to defendant and did not desert defendant.
*87 4. Defendant was not guilty of cruelty to plaintiff.
5. Defendant did desert plaintiff and she is entitled to a limited divorce on that ground.
OPINION
ADKINS, J.
If the Nevada decree is entitled to full faith and credit, this suit should be decided in defendant’s favor. If that divorce is invalid, the question remains whether plaintiff was guilty of cruelty to defendant or whether she deserted him in June, 1931, so as to entitle him to defend her suit on the ground of cruelty or desertion.
I have found as a fact that she was not guilty of cruelty and that she did not desert defendant. In view of defendant’s conduct I think the latter question is not material. Even if she did leave defendant in June, 1931, she subsequently expressed a strong desire to return to him, and it was his duty to furnish her a home.
Plainly upon the evidence defendant deserted plaintiff when he went to Reno to obtain his divorce.
I have found as a fact that the husband did not obtain a domicile in Nevada. The question of law is whether the fact that the wife filed an answer in that case gave jurisdiction to the Nevada court.
In Frey v. Frey, 61 App. D.C. 233, the divorce in question was obtained in Virginia after the husband had filed an answer. The Court of Appeals held the divorce invalid, in part on the ground that plaintiff in the Virginia suit was not domiciled in that state. The Court said:
“A divorce obtained by a person legally domiciled in one state who leaves that state and goes into another solely for the purpose of obtaining a divorce and with no purpose of residing there permanently is invalid and the state of bona fide residence may forbid the enforcement within its borders *88 of a decree of divorce so procured. Citing Andrews v. Andrews, 188 U. S. 14.
“It is established law that, where one spouse goes to a state other than that of the matrimonial domicile, and there obtains a divorce upon a residence simulated for that purpose and not in good faith, the judgment is not binding upon the courts of other states.”
In Andrews v. Andrews, supra, it was expressly held that the validity of the divorce depended upon the domicile of the plaintiff and that without such domicile, in South Dakota, the courts of that state had no authority to decree a divorce, even though the defendant entered an appearance (see 188 U. S. 39).
These cases settle the question for this court. I, therefore, hold the Nevada decree invalid.
See also Lister v. Lister, 86 N. J. 30.
The question of alimony is somewhat difficult. At present the husband is not employed and it is not easy to determine his earning capacity. There is no evidence that since he was served with process he has tried to obtain employment. The present alimony of $40 per month is being paid by his father. Over two years have elapsed since defendant’s marriage. His progress in his college studies during that period is not such as to justify the court in suspending alimony during his further college studies.
If counsel cannot agree upon the amount of alimony I will fix it after hearing their further suggestion.
MEMORANDUM
ADKINS, J.
Counsel have today presented draft of final decree and have discussed at length the earnings of the respective parties.
It appears that the husband is not employed, though according to an affidavit filed by him he has sought employment since January.
*89 The wife has a part time job and is earning $30 a month. She is in bad physical condition and is in need of frequent medical attention and of an operation.
Under» all the circumstances I decide to fix the amount of alimony at $20 a month.
This is based upon the assumption that the husband ought to be able to secure work and pay alimony in this small sum.